# EXHIBIT 1

EXECUTION VERSION

## PURCHASE AND SALE AGREEMENT

This Real Estate Purchase and Sale Agreement (the "Agreement") is entered into as of this *18th* day of March, 2014 ("Effective Date"), between Mint Hill/Kerr/Nashville, LLC, a Delaware limited liability company ("Seller"), and SPC Acquisition Company LLC, a New Jersey limited liability company, as nominee for one or more limited liability companies to be formed ("Buyer"). Seller and Buyer (sometimes individually a "Party" and collectively "Parties"), agree as follows:

Section 1.   Facts.   Seller is the owner of fee simple title to the Land and Improvements.

Section 2.   Sale and Purchase.   Seller shall sell, convey, and assign to Buyer, and Buyer shall purchase, assume and accept from Seller, for the Purchase Price subject to the terms and conditions herein set forth, the following:

(a)   the tract or parcel of land located at 703 East Washington Street, Nashville, Nash County, North Carolina, and more particularly described in Exhibit A attached hereto and depicted on the survey map attached hereto as Exhibit A-1, together with all rights and interests appurtenant thereto, including all of Seller's rights, title, and interest in and to adjacent streets, alleys, rights-of-way, and any adjacent strips and gores of real estate (collectively the "Land"); all improvements and fixtures located on the Land, including the existing retail building (collectively the "Improvements"); and all rights, titles, easements and interests appurtenant to the Land and/or Improvements;

(b)   all of the landlord's interest in and rights, and to the extent first arising on and after the Closing Date (as defined below), all of the landlord's obligations, under the Lease dated July 1, 2005, by and between NLA KD Nashville LLC (the "Original Landlord") and Kerr Drug (the "Original Tenant"), providing for the use and occupancy of the Improvements and Land (the "Lease Agreement"), as assigned to Seller by Original Landlord pursuant to that certain Assignment of Leases and Security Deposits dated September 12, 2005, and assigned by Original Tenant to Walgreens of North Carolina, Inc., a Delaware corporation (the "Tenant"), pursuant to that certain Assignment and Assumption of Acquired Leases dated September 23, 2013; all of the landlord's interest in and rights under that certain Guaranty of the Lease dated February 12, 2014, by Walgreen Co, (the "Guaranty," and collectively with the Lease Agreement, the "Lease"); and all Rents (as hereinafter defined) prepaid for any period on and/or subsequent to the Closing Date; and

(c)   to the extent assignable by Seller and not previously assigned to Tenant as required under the Lease, all of the following, if any, relating solely to the Land and the Improvements: (1) any warranties, guaranties and indemnities, and (2) plans, drawings, specifications, surveys, engineering reports, and other technical information, and (3) permits, certificates, entitlements and other governmental approvals (collectively, the "Warranties, Plans and other Intangible Property").

PURCHASE AND SALE AGREEMENT                1
#10015021

The above-listed items are collectively called the "Property". All of the Property shall be sold, conveyed, and assigned to Buyer at Closing (defined below) free and clear of all liens and encumbrances except for the lien of real property taxes not yet due and payable, and subject to the Permitted Encumbrances (defined below).

Section 3.    **Purchase Price.** The Purchase Price, ("Purchase Price") for the Property shall be Three Million Nine Hundred Sixty Eight Thousand Seven Hundred Ninety and 00/100 Dollars ($3,968,790.00) to be paid as set forth in Section 11.

Section 4.    **Earnest Money.** Within three business days after the Effective Date, Buyer shall deliver to First American Title Insurance Company ("Title Company"), with an address at 104 Carnegie Center, Suite 101, Princeton, NJ 08540, a check or wire transfer in the amount of **$100,000.00** ("First Deposit") pursuant to the terms and conditions set forth and described in the Escrow Agreement attached hereto as **Exhibit B** and incorporated herein by reference, which the Title Company shall deposit in a separate interest-bearing account upon receipt of a completed Form W-9. If this Agreement is not sooner terminated, within three business days after the end of the Due Diligence Period, Buyer shall deliver to Title Company a check or wire transfer in the amount of $100,000.00 ("Second Deposit"). Except as may be otherwise specified in this Agreement, "Earnest Money" shall mean to the extent delivered to the Title Company, the First Deposit and the Second Deposit, together with all interest earned thereon while in the custody of Title Company. The Earnest Money shall be paid to Seller or Buyer, as the case may be, in accordance with any provision of this Agreement that expressly provides for the delivery of the Earnest Money to the Buyer or Seller, as the case may be. At the Closing, the Earnest Money will be paid to Seller and applied as a credit against the Purchase Price. The Title Company is hereby authorized to open an account for the Earnest Money in the name of and/or credit of Buyer.

Section 5.    **Delivery of Information by Seller.** The term "Due Diligence Documents" means (a) the documents described on Schedule 5, attached hereto and made a part hereof and (b) any other documents related to the Property and in Seller's actual possession or control (specifically excluding any documents that are in the control of Tenant). To the extent any of the Due Diligence Documents hereafter come into Seller's actual possession or control, the Due Diligence Documents shall be delivered by Seller to Buyer in PDF within three business days after any such Due Diligence Documents are received by Seller. Buyer acknowledges receipt of the Due Diligence Documents described on Schedule 5.

Section 6.    **Due Diligence Period.** "Due Diligence Period" means a period commencing upon the Effective Date and ending 20 days after the commencement of the Due Diligence Period, Buyer, Lender and their contractors, consultants and representatives, upon 24 hours' prior notice to Seller and Tenant, may enter upon the Property, during the Due Diligence Period and thereafter until the Closing, to inspect, survey and appraise the Property and conduct their due diligence review of the same, and may conduct tests and examinations with regard thereto, all of the above subject to the rights of the Tenant under the Lease; provided, however, that Buyer shall not conduct any invasive testing without Seller's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. Buyer shall promptly restore the Property to substantially the same condition in which it existed immediately prior to any physical tests conducted by or on behalf of Buyer or Lender. Buyer shall defend, indemnify

2

and hold Seller and Tenant harmless from any and all damages, liabilities or claims caused by the acts of Buyer or Lender and their employees, agents or contractors, in exercising their rights under this Section 6. This indemnity provision shall survive the termination of this Agreement and Closing. Buyer agrees and covenants with Seller not to conduct or cause to be conducted any written or oral communications with Tenant without at least forty-eight (48) hours' prior written notice to Seller. Seller shall have a right to have a representative present during any tenant interviews. If during the Due Diligence Period, Buyer elects to proceed with the purchase of the Property, Buyer shall give Seller notice of such election by the end of the Due Diligence Period ("Due Diligence Approval Notice"). If Buyer fails to timely give Due Diligence Approval Notice, then this Agreement, and the transactions contemplated herein, shall automatically be terminated and all Earnest Money shall promptly be delivered to Buyer despite any objection or demand by Seller and without Seller's authorization and consent, and neither party shall have any further rights or claims hereunder except those which specifically survive the termination of this Agreement. In the event this Agreement is not terminated by Buyer in accordance with this Section 6, and except as set forth in Section 16(d) herein, then the Earnest Money shall (x) inure to Seller; (y) be non-refundable to Buyer; and (c) be payable in accordance with Section 4 or Section 16(b) herein, as the case may be.

Section 7.   Title; Survey.   Buyer may obtain a Title Commitment and Title Documents. "Title Commitment" means a commitment issued by the Title Company for an ALTA extended coverage owner's title insurance policy insuring the fee simple title to the Land and Improvements is vested in the Buyer, with coverage in the amount of the Purchase Price. "Title Documents" shall mean each document referred to in the exceptions in the Title Commitment. Buyer may obtain a current "as built" ALTA/ACSM survey of the Land and Improvements ("Survey"). Buyer may give Seller notice of Buyer's objections to any encumbrances, encroachments, liens, defects, clouds on title, exceptions, requirements, states of fact and other matters reflected by the Title Commitment, Title Documents or Survey ("Buyer's Objection Notice"); provided, however, that the deadline for giving Buyer's Objection Notice is the last day of the Due Diligence Period ("Objection Period"). All matters to which Buyer so objects shall be "Non-Permitted Encumbrances." In addition, Seller shall be obligated to remove by Closing all mortgages, deeds of trust, judgment liens, mechanic's and materialmen's liens, and other monetary liens against the Property, to the extent that the same can be removed by payment of a sum certain (other than the liens for taxes and assessments which are not delinquent) ("Mandatory Removal Liens"), whether or not mentioned in a timely Buyer's Objection Notice. If Seller fails to give Buyer notice within ten days following receipt of Buyer's Objection Notice of Seller's agreement to make diligent efforts to cause all Non-Permitted Encumbrances to be removed or cured ("Seller's Notice"), then Buyer shall have the right to either (a) terminate this Agreement without liability for termination, by giving notice to Seller within ten days after the later of Buyer's receipt of Seller's Notice, or the date Seller's Notice is due, whereupon the Earnest Money shall be promptly delivered to Buyer, or (b) waive Buyer's objection to the Non-Permitted Encumbrances (other than the Mandatory Removal Liens that Seller is obligated to remove, and Non-Permitted Encumbrances which Seller has given notice Seller will make efforts to remove or cure). "Permitted Encumbrances" means (x) except for Mandatory Removal Liens, all recorded exceptions which are disclosed in the Title Documents and Revised Title Information which Buyer does not timely object to in the Buyer's Objection Notice; and (y) except for Mandatory Removal Liens, all recorded exceptions reflected in the Title Documents and Revised Title Information which (I) Buyer does timely object to but which Seller does not timely satisfy or give notice Seller will make efforts to remove or cure in Seller's response to Buyer's Objection Notice or a Buyer's

Supplemental Objection Notice, and (II) which Buyer waives by not giving notice of Buyer's election to terminate this Agreement; and (z) the Lease, Seller shall remove Mandatory Removal Liens by (1) payment in full and satisfaction of record; (2) bonding in the manner prescribed by Law to cause the removal of the Mandatory Removal Lien from the Property; or (3) by making arrangements in advance of the Closing with the Title Company, to cause the applicable Buyer's Title Policy to omit as exceptions the Mandatory Removal Liens. If any revised, supplemental or amended Title Commitment (collectively "Revised Title Information") discloses any exception, requirement or state of facts not reflected in a previous Title Commitment or adversely modifies any exception, requirement or state of facts in any previous Title Commitment and the same was not created by Buyer ("New Exception"), then: (A) Buyer shall have ten days after receipt of the Revised Title Information, to give Seller a notice objecting to the New Exception (each a "Buyer's Supplemental Objection Notice"); (B) Seller shall give Buyer a Seller's Notice within ten days after receipt of the Buyer's objection notice; and (C) the parties' rights and obligations with respect to the New Exception shall otherwise be as provided for in this Agreement.

Section 8.     <u>Seller's Representations and Warranties.</u>

8.1.     Seller hereby represents and warrants to Buyer that:

(a)     Seller has no actual knowledge and has received no actual notice of any unrecorded agreements, covenants, conditions or restrictions related to the Property, by which the Property or Buyer would be bound;

(b)     Seller has no actual knowledge and has received no actual notice of any pending investigations, or pending or threatened administrative, civil, bankruptcy, criminal or arbitration, actions, proceedings or other litigation, which are related to or could materially affect: the Seller's fulfillment of Seller's obligations and warranties in this Agreement, Lease, the Property, and/or the use or operation of the Property, including without limitation intended, the Property's zoning, design, construction, warranties, parking, access, signage and/or visibility;

(c)     Seller has no actual knowledge and has received no actual notice: (i) that any event has occurred or condition arisen which either constitutes, or would constitute with the passage of time or giving of notice or both, a breach or default by Tenant under the Lease and/or the landlord under the Lease, or which would otherwise give the Tenant any right to terminate the Lease or abate or offset Rent in whole or in part; and (ii) of any outstanding notice of default, breach, Rent abatement or offset, outstanding notice of termination of the Lease or re-entry under the Lease;

(d)     Seller has not granted Tenant any economic or financial concession or inducement which is not reflected in the Lease, including without limitation intended, any bonus, free rent or rent reduction;

(e)     There are no unpaid commissions or fees payable by Seller to any broker or finder in connection with the Lease or any renewal or extension of the Lease;

4

(f) Except as may be otherwise disclosed in this Agreement, the Seller has fulfilled all of its obligations under the Lease which are conditions of the obligations of the Tenant to begin payment of the Rents, including without limitation intended, all work, improvements and economic concessions required to be furnished by the Seller pursuant to the Lease;

(g) Seller has no actual knowledge and has received no actual notice that Tenant plans to give up physical or legal possession of all or any part of the Land and Improvements, including without limitation intended by: assigning the Lease; subletting of all or part of the Land and Improvements; vacating all or part of the Land and Improvements; discontinuing its operations on the Land and Improvements in whole or in part; surrendering possession; or terminating the Lease;

(h) The sale of the Property to the Buyer and the performance of this Agreement including execution and delivery of the Lease Assignment to Buyer, will not result in any breach of, or constitute a default under, any instrument to which Seller is a party or by which Seller may be bound or affected;

(i) Seller has full right, power, and authority to execute and deliver this Agreement and to consummate the Closing without obtaining any further consents or approvals from, or the taking of any other actions with respect to, any third parties; and this Agreement, when executed and delivered by Seller and Buyer, will constitute the valid and binding agreement of Seller, enforceable against Seller in accordance with its terms;

(j) Intentionally deleted.

(k) Except as may be disclosed in the ESA (as hereinafter defined) and the substances and materials stocked and/or used by the Tenant; Seller has received no actual notice and has no actual knowledge of the presence, release or migration of any Hazardous Materials in, on, under or adjacent to the Property. "Law" means law and common law, and any treaty, code, statute, ordinance, regulation, rule, order, judgment or decree enacted, adopted, imposed, issued, entered or filed by any Government. "Government" means any federal, interstate, state, regional, county, municipal governmental, intergovernmental or quasi-governmental branch, authority, district, agency, court, tribunal, department, officer, official, board, commission or other instrumentality. "Hazardous Materials" means any hazardous or toxic substance, hazardous or toxic material, and/or hazardous or toxic waste, or any other substance which is categorized by any Law as harmful or likely to be harmful to humans, fish, wildlife, or the environment, including without limitation intended, petroleum products, petroleum fractions, petroleum additives, asbestos, radioactive materials, radon, mold, PCBs, mercury and lead.

(k) Except as may be disclosed in the ESA, Seller has received no actual notice and has no actual knowledge that any underground storage tanks are located in or were removed from the Property;

(l) Seller is not a "foreign person" as defined in Section 1445(f)(3) of the Internal Revenue Code and regulations issued thereunder, and if Seller is a disregarded entity for federal income tax purposes, Seller's "taxpayer" is not a "foreign person" as defined by Section 1445(f)(3);

(m)     Except as may be disclosed in the PCA (as hereinafter defined) Seller has received no actual notice of any condition on or about the Property which would cause the Property or any part thereof, or the use or operation of the Property, to be in violation of, or out of compliance with any Law;

(n)     Except as set forth in the Title Commitments or as set forth on any real estate tax bill or statement for the Land and Improvements delivered to Buyer as part of the Due Diligence Documents, neither the Seller or its agents have received any notice and neither the Seller or its agents have any knowledge of any assessments or special taxes which may encumber the Land and Improvements or any part thereof, on or after the Closing Date;

(o)     Except as may be disclosed in the PCA, Seller has no actual knowledge and has received no actual notice of any structural or other material defect in the Improvements (including without limitation intended, the footings, foundation, slab, mechanical and utilities systems, the roof, the heating and air conditioning equipment), nor of any need for any extraordinary repair of the Improvements;

(p)     Except as may be disclosed in the PCA, Seller has no actual knowledge and has received no actual notice that the Land and Improvements or any part thereof, has suffered any material damage and/or required any material repairs as a result of any earthquake, settlement, leak, flood, ponding, fill or inadequate drainage;

(q)     Intentionally Omitted;

(r)     Intentionally Omitted;

(s)     Intentionally Omitted;

(t)     Seller has no actual knowledge and has received no actual notice of any outstanding breach, default, or notice or claim of breach, default or termination under any declaration, easement or other encumbrance affecting the Land and Improvements;

(u)     Seller has received no actual notice of any outstanding work order, or unfulfilled requirements or recommendations issued, imposed or made by any mortgagees, insurers or their respective agents, concerning the Property or any part thereof; and

(v)     (i) The copies of the Due Diligence Documents, agreements and other materials delivered and to be delivered to Buyer under this Agreement are true and correct copies of those documents, agreements and materials in Seller's custody and/or control; (ii) Seller has no actual knowledge and has received no actual notice that the copies in Seller's custody and/or control vary in any material respect from the originals; and (iii) the Lease is a true and complete copy of the original; but Seller makes no other representations or warranties of any kind with respect to any Due Diligence Documents including without limitation, their accuracy or completeness.

8.2.     Seller's representations and warranties shall be true as of the Effective Date and on the Closing Date. If any representation or warranty made by Seller in this Agreement becomes untrue, Seller shall give Buyer notice specifying the inaccuracies as soon as Seller has such knowledge or has received such notice. If any representation or warranty was true as of the date of this Agreement, later became

untrue in any material respect for reasons outside Seller's reasonable control, and Buyer elects in a notice given to Seller prior to Closing to declare this Agreement null and void, then neither party shall have any rights or obligations hereunder, except that all Earnest Money including interest, shall be promptly delivered to Buyer. Consummation of the Closing by Buyer with actual knowledge or actual notice of any breach of a representation or warranty not within the reasonable control of the Seller, shall be deemed a waiver or release by Buyer of any claims hereunder due to such breach. All representations and warranties contained in this Agreement shall survive Closing for the benefit of Buyer for a period ending on the first year anniversary of the Closing and will continue to survive the Closing with respect to any claim which Buyer has given Seller notice of by the first year anniversary of the Closing.

8.3.    The Parties shall severally indemnify, protect, defend and hold each other harmless, from and against all (i) Timely Asserted Claims, Occurrences and Damages, and (ii) all related costs, expenses, penalties and fines (including without limitation intended, reasonable attorneys' fees, accountant's fees, disbursements, expert witness fees, paralegal fees, reporters' fees, taxes, reproduction and printing costs, including any of the foregoing which are incurred in connection with any dispute, litigation, appeal, bankruptcy or arbitration proceeding, and amounts paid in settlement of claims (collectively "Litigation Expenses"). "Timely Asserted Claims, Occurrences and Damages" means claims, occurrences, liabilities and damages which are both: (a) paid or incurred by the party seeking indemnification, as a result of any representation or warranty of the other party (set forth in this Agreement) being untrue in any material respect and unknown at the time of Closing by the party relying upon the representation or warranty; and (b) which the party seeking indemnification gives notice of to the other party within one (1) year following Closing.

Section 9.    __Conditions to Buyer's Performance__.  The obligation of Buyer to complete the Closing, at the sole option of Buyer, shall be subject to the satisfaction of each of the following conditions precedent:

(a)    All of the representations and warranties by Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date;

(b)    Seller shall have fully performed the obligations of Seller in this Agreement;

(c)    Intentionally Omitted.

(d)    Seller shall have delivered to Buyer, not later than five business days prior to the Closing Date: (i) an estoppel letter for the Lease signed by the Tenant on Walgreen Co.'s standard form, dated no earlier than 30 days prior to the Closing, addressed to Buyer and Lender and their successor and assigns ("Tenant Estoppel"); and (ii) an original subordination, non-disturbance and attornment agreement for the Lease, executed by the Tenant in the Walgreen Co.'s standard form, and acceptable to Lender ("Lease Subordination, Non-disturbance and Attornment Agreements"). "Lender" means the bank or other first mortgage lender identified by Buyer in notice given to Seller within three business days after the end of the Due Diligence Period. Notwithstanding anything to the contrary set forth in this Agreement, if the Tenant Estoppel and Lease Subordination, Non-Disturbance and Attornment Agreement cannot be delivered within five (5) business days prior to the Outside Closing Date, then Seller or Buyer may, but shall not be obligated to, postpone the Outside Closing Date for a period not to exceed thirty (30) days to permit Seller to provide the Tenant Estoppel and Lease Subordination, Non-Disturbance and Attornment Agreement;

(e)     Intentionally Omitted;

(f)     The contents of the Tenant Estoppel is consistent in all material respects with: (i) the representations and warranties of the Seller in this Agreement; and (ii) the Lease, including without limitation, the Tenant Estoppel contains no allegation of any breach or default, offset, abatement, termination, notice of breach or default;

(g)     Seller shall make commercially reasonable efforts to deliver to Buyer, at least ten days prior to the Closing Date, Tenant's insurance certificates;

(h)     Intentionally Omitted;

(i)     Title to the Property, is delivered in accordance with the provisions of this Agreement and the Title Company is unequivocally obligated to insure the fee simple title to the Land and Improvements is vested in the Buyer: (i) subject only to: (x) the Permitted Encumbrances; (y) fulfillment of any requirements imposed on the Buyer in the Title Commitments; and (z) payment of the premiums for the applicable Buyer's Title Policy; and (ii) with such endorsements as the Title Company has committed or agreed in writing to provide;

(j)     Intentionally Omitted;

(k)     None of the following events have occurred: the Lease has been terminated or Tenant has given notice of its election to terminate the Lease, delay payment of Rent after the end of any cure period or to cease operations on all or part of the Land and/or Improvements, or Tenant is the subject of any petition filed for relief under Title 11 of the U.S. Code, or Tenant has publicly announced its intention to seek relief under Title 11 of the U.S. Code, or Tenant defaults under any material debt obligations, or if there is any material outstanding breach or default under the Lease or any outstanding notice of any material breach or default under the Lease or any allegation of any material breach or default by the Seller under the Lease, or if the Tenant has any outstanding right to terminate the Lease, or if the Tenant claims there is any outstanding right of offset against Rent in Tenant's favor, or if Tenant has assigned the Lease or sublet more than 20.00% of the usable floor area demised by the Lease, or if Tenant has given notice of its election or intention to assign the Lease or sublet more than 20.00% of the usable floor area demised by the Lease, or if Tenant has requested the Seller's approval of or consent to Tenant's assignment of the Lease or sublease of more than 20.00% of the usable floor area demised by the Lease. For purposes of this paragraph, the word "Tenant" shall also mean and include any guarantor of the Lease;

(l)     There has been no change in zoning or applicable Law that would cause the use or operation of Land and Improvements contemplated by the Lease to be in violation of applicable zoning or other Law or to constitute a non-conforming use; and

(m)     Seller shall have provided the Tenant with all annual statements and reconciliations, if any are required by the Lease, for the five most recently completed years prior to the Closing and delivered copies thereof to Buyer at least ten business days prior to the Closing; and, if a reconciliation is required by the Lease for the calendar year in which the Closing falls, Seller shall have delivered to the Buyer at least

8

ten business days prior to the Closing, a reconciliation covering the current calendar year up to a date not more than 30 days prior to the Closing.

(n) If the Land or any part is subject to any reciprocal easement agreement or declaration which is not an agreement granting an easement to a public utility or public right-of-way ("REA"), at least five business days prior to the Closing, Seller delivers to the an estoppel letter signed by the other party(ies) to the REA dated no earlier than 30 days prior to the Closing, addressed to Buyer and Lender and their successor and assigns, in the form that is attached to this Agreement as **Exhibit C** ("REA Estoppel"); and (ii) the contents of the REA Estoppel are materially consistent with: (x) the representations and warranties of the Seller in this Agreement; and (y) the Title Documents, including without limitation, the REA Estoppel contains no allegation of any breach or default, termination, abandonment or notice of breach or default.

Buyer shall have the right to unilaterally waive any condition herein set forth. If any such condition has not been satisfied or waived in writing by Buyer as of the Outside Closing Date or such earlier date provided for above, Buyer's sole options shall be to (i) in the absence of a Default by Seller, terminate this Agreement without liability for termination, by notice given to Seller prior to Closing, whereupon the Earnest Money shall be promptly delivered to Buyer and neither party shall have any further rights or obligations under this Agreement, except those that survive Closing, or (ii) in the event of a Default by Seller, pursue its remedies set forth in Section 16 herein.

To the extent within the reasonable control of the parties, the parties will make commercially reasonable good faith efforts to satisfy the conditions to their performance and those of the other party.

Section 10. **Closing.** The closing of the sale of the Property by Seller to Buyer ("Closing") shall occur on or before a date 30 days after the expiration of the Due Diligence Period ("Outside Closing Date"). The date the Closing occurs is referred to as the "Closing Date". The Closing shall occur without the need for a personal appearance by either party, through the submission of all executed closing documents and required funds in escrow to the Title Company along with written escrow instructions from each party ("Escrow Closing"). An escrow officer of the Title Company will coordinate the Closing with the Title Company's branch office or its affiliate in the county(ies) in which the Property is located. Buyer shall have the right to extend the Outside Closing Date for an aggregate period not exceeding 30 days, by giving notice of such extension to the Seller, and making an additional Earnest Money deposit in the amount of $100,000.00, which deposit shall, notwithstanding anything to the contrary set forth in this Agreement, constitute Earnest Money for all purposes. Seller shall provide the Title Company with any information with respect to Seller or its agents, in connection with the conveyance of the Property by the Seller to the Buyer required by either (i) Code Sec. 6045 or Treas. Regs. Sec. 1.6045, or (ii) Treas. Form 1099 or its instructions. If required thereby, the Title Company shall timely (x) prepare and file a Form 1099 in accordance with the provisions of Treas. Regs. Sec. 1.6045, and (y) furnish the Parties with copies.

Section 11. **Buyer's Closing Deliveries.** Except as otherwise provided below, Buyer, at its expense, shall deliver or cause to be delivered to Seller at Closing through the Escrow Closing, the following:

(a)     to the Title Company, the Purchase Price minus the Earnest Money, by wire transfer or other immediately available funds;

(b)     Assignments and Assumption of Lease and Guaranty in the form attached to this Agreement as **Exhibit D,** ("Lease Assignment") to be prepared by Seller, fully executed and acknowledged by Buyer;

(c)     If there are any Property Agreements which the parties have mutually agreed will be assigned to and assumed by the Buyer, an assignment and assumption thereof in a form to be mutually agreed upon by the parties and fully executed by the Buyer ("Property Agreement Assignment");

(d)     letters ("Sale Notices") in forms to be mutually agreed upon by the Buyer and Seller addressed to the parties to the Property Agreements, if any, and in the form attached to this Agreement as **Exhibit E,** addressed to the Tenant, enclosing copies of Lease Assignment or Property Agreement Assignment, as applicable, advising them of the sale of the Property and the Buyer's right to the Rent, services and performance required by the terms of their respective Lease or Property Agreement;

(e)     evidence satisfactory to Title Company that the Buyer is duly organized and in good standing and that the persons executing the Closing documents on behalf of Buyer have full right, power, and authority to do so; and

(f)     such other documents as may be reasonably requested by the Title Company or Seller in accordance with this Agreement.

Section 12.     **Seller's Closing Deliveries.**  Seller, at its expense, shall deliver or cause to be delivered to Buyer the following:

(a)     Lease Assignment, fully executed and acknowledged by Seller;

(b)     Fully executed and acknowledged special warranty deed or local equivalent in a  form reasonably acceptable to the Title Company and Buyer's lawyer (the "Deed");

(c)     Sale Notice(s), fully executed by the Seller;

(c)     If there are any Property Agreements which the parties have mutually agreed will be assigned to and assumed by the Buyer, a Property Agreement Assignment fully executed by the Seller;

(d)     Bills of Sale and Miscellaneous Assignment in the form attached to this Agreement as **Exhibit F,** fully executed by the Seller, assigning and transferring all of Seller's right in and to the Warranties, Plans and other Intangible Property;

(e)     Certificates meeting the requirements of Section 1445 of the Internal Revenue Code of 1986 as amended, and the regulations adopted thereunder, executed and sworn to by Seller or the taxpayer if Seller is a disregarded entity for federal income tax purposes, confirming Seller or the taxpayer, as applicable, is not a "foreign person";

10

(f)     Evidence reasonably satisfactory to Title Company that the persons executing the Closing documents on behalf of Seller have full right, power, and authority to do so and that Seller is duly organized and in good standing;

(g)     Such other documents as may be reasonably requested by the Title Company or by Buyer in accordance with this Agreement and are customarily executed in the state in which the Land is located, to effectuate the closing of a sale of commercial property similar to the Property, including without limitation, Closing escrow instructions, settlement statement and an affidavit required of a seller by the Title Company;

(h)     To the extent not previously furnished to the Buyer:

(i) all plans, drawings and specifications (including as-built and digital) in the Seller's actual possession or control for the Improvements and any proposed buildings or other improvements;

(ii) all Property Agreements assigned to Buyer, warranties and guaranties pertinent to the Property in Seller's actual possession or control;

(iii) the original Lease; and

(iv) all documents and records which the Lease obligates the landlord to maintain or obtain prior to Closing.

(i)     A certificate confirming that all of the representations and warranties made by the Seller in this Agreement are true and correct as of the Closing, except as may be specified therein; and

(j) All declarations, returns, affidavits and other instruments required to record the Deed or otherwise required to be filed by the Seller by applicable Law.

Section 13.   **Closing Costs; Prorations.**

13.1.  Closing Costs:

(a)     Seller, at Closing, shall pay all transfer taxes (if any), deed and documentary taxes, intangible taxes or similar taxes or assessments payable in connection with transfer of title to real property in the state, county, township and municipality in which the Property is located, and 50.00 percent of the Title Company's escrow and closing fees. Seller shall pay all recording fees for recorded instruments necessary to remove Mandatory Removal Liens and any other encumbrances which are not Permitted Encumbrances.

(b)     Buyer shall pay the cost for Buyer's title policy for the Property, any and all endorsements and/or for extended coverage, and any lender's title insurance policy; and any related title examination fees the Title Company is entitled to.

(c)    Buyer shall pay at Closing all filing and recording fees with respect to any purchase money financing related documents, such as mortgages and/or assignment of rent and leases, and all recording fees for the Deed. Buyer shall pay the fees for the Survey and 50.00 percent of the Title Company's escrow and closing fees.

(d)    Intentionally Omitted.

(e)    All other Closing costs shall be allocated between the Parties consistent with the custom and practice in similar transactions in the county in which the Property is located. Except as otherwise provided in this Agreement, each Party shall pay their own legal fees and expenses.

13.2.    Prorations.  Buyer and Seller shall apportion or adjust as applicable, as of 11:59 PM of the day preceding the Closing, the items hereinafter set forth.  The items to be apportioned or adjusted are:

(a)    city, state, county, school, special district and all other ad valorem taxes and other assessments payable with respect to the tax year in which the Closing occurs; should such proration be inaccurate based on the actual millage set forth on the ad valorem tax bill if the current tax bill has not been received by the Closing Date, either party may demand after the date of Closing, that such taxes and assessments be re-prorated based on the actual bill and shall be entitled to receive upon demand, any amount owing to such party based on such re-proration; provided, however, that if such taxes and assessments are paid directly by the Tenant to the applicable governmental authority, there shall be no proration;

(b)    all base rent and additional rent and similar charges (collectively "Rents") to the extent collected by Seller.  Any base rent, additional rent or other charges received from Tenant after the Closing shall be applied in the following order of priority:

i.    First, to any Rents then owing for any calendar month or months following the calendar month in which the Closing occurred; and

ii.    Second, to the Rents owing for the calendar month in which the Closing occurred; and

iii.    Third, to Rents owing for any calendar month or months preceding the calendar month in which the Closing occurred until the Tenant is current.

To the extent delinquent amounts for Rents for the period prior to the Closing ("Delinquent Rents") are collected by Buyer, subject to clauses (i), (ii) and (iii) above, such amounts, net of reasonable costs of collection, including without limitation, reasonable attorney's fees, shall be paid to Seller no later than thirty (30) days following the date on which such amounts have been received by Buyer or its agent.  Buyer shall not be obligated to expend any funds, commence legal proceedings, exercise any Lease remedies or do anything else to collect Delinquent Rents.  Seller retains the right to pursue its remedies against Tenant after Closing for any delinquent payments or other amounts owed to Seller, but solely for a money judgment and not for any other form of relief.  Seller shall indemnify, defend, protect and hold Buyer and its successors and assigns harmless from any liabilities, damages, claims, suits, costs and expenses including Litigation Expenses which may be incurred by Buyer and its successors and assigns arising out of any effort by Seller to pursue any claim against Tenant.

(c)  All public utility charges not paid by the Tenant (pursuant to the Lease directly to the applicable provider) with respect to the Property shall be prorated at the Closing effective as of the Closing Date, and appropriate cash adjustments shall be made by Buyer and Seller.

(d)  At Closing, any prepaid Rents and security deposits under the Lease (together with any interest accrued thereon) shall be transferred to Buyer either directly or by way of a credit in favor of Buyer.

(e)  If, at Closing, the Property or any part thereof shall have been affected by an assessment or assessments, which are or may become payable in annual installments, of which the first installment is then a charge or lien, and which are not paid or payable by the Tenant pursuant to the Lease, then to the extent such assessment(s) is for improvements or impacts in place as of the date of this Agreement, such assessment(s) shall be paid by Seller but if such assessment(s) is for improvements to be made subsequent to the date of Closing, then the same shall be paid by Buyer.

(f)  Any other items of income and expense not specifically mentioned in this Section 13.2 shall be apportioned if customarily apportioned in similar commercial real estate transactions in the State in which the Property is located.

To the extent that the apportionments and adjustments at the Closing are not based upon final figures or there are any errors or omissions in the calculation or determination thereof, promptly after notice of such final figures or errors or omissions (including the calculations used to arrive at the final figures or errors or omissions), the Parties shall readjust or reapportion and make the payment required as a result thereof.  If either Party requests a determination of final figures or errors or omissions, the party in possession of the applicable books and records (including digital) shall within 15 days after a request made by the other Party, provide the requesting Party with any documents (including electronic records) and information reasonably requested by the Party to enable the requesting Party to verify or calculate the final figures or errors or omissions.  Any net adjustment in favor of Buyer or Seller is to be paid by the other no later than 30 days after such final adjustment has been made.  Any amounts not paid within such 30 day period shall bear interest from the date payment is due until paid at the greater of (i) the rate of ten percent (10%) per annum or (ii) the prime rate (or base rate) reported from time to time in the "Money Rates" column or section of The Wall Street Journal as being the base rate on corporate loans at larger United States money center commercial banks plus two (2) percent.

Section 14.  **Destruction, Damage, or Taking Before Closing.**  If, before Closing, all or any part of the Land and Improvements or any access to or from the Land, is materially damaged, or becomes subject to pending or threatened condemnation, or is the subject of a proposal or request by any Government or any other person with the power of eminent domain, for a sale of land, improvements or easement in lieu of condemnation or condemnation proceedings (collectively "Damage Event"); then Seller shall promptly and in all circumstances prior to Closing give notice thereof to Buyer.  Buyer may elect to proceed with the Closing (subject to the other provisions of this Agreement and with no reduction in the Purchase Price) by delivering notice thereof to Seller within ten business days after receipt of Seller's notice respecting the Damage Event, but in such event Buyer shall be entitled to: (i) all insurance proceeds, condemnation awards or sales proceeds payable as a result of such Damage Event, and (ii) if there was a casualty, a credit against the Purchase Price in the amount of the insurance

deductible or self-retention limit;  and, to the extent the same may be necessary or appropriate, Seller shall assign to Buyer at Closing Seller's rights to such proceeds or awards. If, within ten business days of receipt of Seller's notice respecting the Damage Event, Buyer notifies Seller of Buyer's election to terminate this Agreement, or if Buyer gives no notice within such period, then Buyer shall be deemed to have terminated this Agreement without liability for termination; and in either case the Earnest Money shall promptly be delivered to Buyer. The Outside Closing Date shall be extended as necessary to provide the Buyer with the full ten business day period provided for in this Section 14. Damage shall be deemed to be "material" for purposes of this Section 14 if: (i) the damage arises from a casualty for which there is no replacement cost casualty insurance coverage which covers the entire cost of replacement, minus the deductible; (ii) the cost of restoration exceeds $100,000.00; (iii) the damage causes Buyer's mortgage lender to refuse to complete the closing of Buyer's mortgage loan by the Outside Closing Date; (iv) the damage gives the Tenant any right to abate or offset any rent or additional rent and Seller has no rent loss insurance coverage in effect prior to the Closing which will cover all of the reasonably anticipated rent and additional rent loss Buyer will incur on and after the day of Closing; (v) the damage gives the Tenant any right to terminate the Lease or reduce rent or additional rent; (vi) gives the Tenant any right to terminate the Lease or reduce rent or additional rent if the landlord fails to provide substitute or additional parking, access or other common area; or (vii) the Tenant Estoppel fails to confirms in writing that Tenant will accept occupancy and continue under its Lease after restoration of the Improvements.

Section 15.    **Conduct Of Business Prior To Closing.**

15.1. Until the Closing, Seller shall:

(a) Make diligent efforts to cause the Tenant to fulfill all of the Tenant's material obligations under the Lease;

(b) Perform all of the landlord's, borrower's and Property owner's obligations under the Lease, the mortgages and the Permitted Encumbrances;

(c) Not terminate, amend, modify, extend, renew, waive or accept the surrender of the Lease or provision thereof, without the Buyer's prior consent, which with respect to any amendment, modification, extension or renewal shall not be unreasonably withheld, conditioned or delayed;

(d) Not terminate, amend, modify, extend, renew, waive or accept the cancellation of any Permitted Encumbrance or any provision thereof, without the Buyer's prior written consent, which shall not be unreasonably withheld, conditioned or delayed;

(e) Not enter into, accept or consent to any new (i) lease, occupancy agreement, subtenancy agreement, license agreement, concession agreement, tenancy, subtenancy, license or concession); (ii) contract or agreement; (iii) lien, encumbrance, or security interest (including without limitation intended, mortgage, deed of trust, security agreement, assignment of leases or rents) or other title exception or defect (including without limitation intended, easement, restriction, covenant, declaration, or dedication), without the Buyer's prior written consent;

14

(f) Not commence any action or proceeding or petition, apply for or consent to any action or proceeding, the effect of which may be to change the zoning of the Property or its assessed valuation;

(g) Not sell, assign or transfer the Property or any part thereof, nor grant any option or right of first refusal, sell, assign or transfer the Property, nor enter into any executory agreement for the sale, assignment or transfer of the Property or any part thereof, including without limitation intended, the fixtures; provided, however, that the Seller may remove fixtures for the purpose of promptly effecting necessary repairs or immediate replacement with fixtures of like character and equal or better quality.

(h) Not take any other action which would cause the representations and warranties in this Agreement made as of the Effective Date to become untrue or incorrect in any material respect as of the Closing; and

(i) Promptly deliver to Buyer a copy of any material notice or other communication received or given by the Seller, and any tax or assessment bills received by Seller after the Effective Date.

15.2. All work to be performed and all payments to be made prior to the Closing, by the Seller or its predecessors in interest, pursuant to the provisions of the Lease, the Permitted Encumbrances, the mortgages, the Law and any insurance policy providing coverage for the Property or any part thereof, shall be performed and paid for by the Seller prior to the Closing.

Section 16.    **Termination and Remedies.**

(a) Upon a material breach of either Party's ("Defaulting Party") obligations, representations or warranties in this Agreement, the other Party ("Non-Defaulting Party") may give the Defaulting Party notice specifying the material breach. ("Notice of Breach"). The Defaulting Party shall have the following applicable cure period ("Grace Period"); either: (a) a ten day cure period after the date the Notice of Breach is given, with respect to any obligation to be performed more than 20 days prior to Closing or a breach of a representation or warranty which is discovered by the Non-Defaulting Party more than 20 days prior to Closing; or (b) a five business day cure period after the date the Notice of Breach is given with respect to any other obligation to be performed or any other breach of a representation or warranty. The term "Default" means a material breach of a Party's obligations, representations or warranties which is not cured after Notice of Breach is given by the Non-Defaulting Party and prior to the expiration of the applicable Grace Period.

(b) If Buyer Defaults and Seller does not Default, then Seller may terminate this Agreement by giving notice of termination to Buyer prior to Closing, in which event Title Company shall promptly deliver the Earnest Money to Seller. Except for any indemnification obligation of the Buyer in this Agreement and except as set forth in Section 16(e) herein, the Seller's sole and exclusive remedy in the event of a Default by the Buyer is recovery of damages in the amount of the Earnest Money.

(c) If Buyer terminates this Agreement pursuant to Buyer's rights to do so under this Agreement and Seller is not in Default, then the Earnest Money shall promptly be delivered to Buyer, whereupon neither Party hereto shall have any further rights or obligations hereunder, except for those which expressly survive the termination of this Agreement.

15

(d)    If Seller Defaults, Buyer shall have the right to: (i) terminate this Agreement by giving notice to Seller, in which case the Earnest Money shall promptly be delivered to Buyer and Buyer shall be entitled to reimbursement of Buyer's out-of-pocket expenses not to exceed $50,000.00; (ii) seek specific performance in which case the Buyer shall be entitled to reimbursement of Buyer's out-of-pocket expenses not to exceed $50,000.00 to the extent the Buyer's expenses will be increased or duplicated as a result of the delay in Closing; or (iii) if the breach underlying the Seller's Default was brought about by the willful misconduct of Seller, then Buyer shall have the right to seek any remedy available.

(e)    In addition to any remedy provided for in this Section 16, the prevailing party in any litigation arising out of any this Agreement, shall be entitled to recover any and all Litigation Expenses. The provisions of this paragraph shall survive the termination of this Agreement or the Closing and any liability arising under this paragraph shall be in addition to any other liability of a Party under this Agreement despite anything in this Agreement to the contrary.

Section 17.  . Notices. All notices and other communications provided or permitted to be given under this Agreement must be in writing and sent by: (i) deposit in the United States or Canada Post mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested; (ii) delivery to and acceptance by a reputable nationally recognized overnight courier service; (iii) fax with printed or PDF confirmation of successful transmission thereof ("Fax Transmission Report"); or (iv) e-mail with an acknowledgment of receipt by the addressee party or the addressee party's lawyer ("Email Acknowledgment") which Email Acknowledgment the addressee party hereby agrees to provide. Notices and other communications given in accordance herewith shall be deemed given upon delivery to the address of the addressee party, or delivery attempted at the address of the addressee Party during ordinary business hours; provided, however, that any notice given by fax or e-mail transmission shall be deemed given on the date the Fax Transmission Report or Email Acknowledgment is made, as applicable. For purposes of notice and other communications, the addresses of the parties shall be as follows:

If to Seller to:  Mark Bozzone
                103 Brilliant Avenue
                Pittsburgh, Pennsylvania 15215
                Fax # 412-782-3924
                E-mail: mark@baydevco.net

With a contemporaneous copy to:    Buchanan Ingersoll & Rooney
                                 301 Grant Street, 20th Floor
                                 Pittsburgh, Pennsylvania 15219
                                 Attn: Scott W. Irmscher, Esq.
                                 Phone #: 412-562-8800
                                 Fax #: 412-562-1041
                                 E-mail: scott.irmscher@bipc.com

16

If to Buyer to:    Attn: Donald L. Hanson
SPC Acquisition Company LLC.
235 Moore Street, Suite 304
Hackensack, NJ 07601
Phone #:    201-488-9455
Fax #:    201-488-9474
E-mail:    dhanson@rlcnet.com

With a contemporaneous copy to:    Mark Tipperman
760 Gaspereau River Road
PO Box 2249
Wolfville NS B4P 2N5
Phone #: 541-963-5214
Fax #: 888-308-5696
E-mail: mark@relawyer.org

If to Title Company to:    Attn: David Grodnick, Vice President / Legal Counsel
First American Title Insurance Company
104 Carnegie Center, Suite 101
Princeton, NJ 08540
Phone #: (609) 524-6344
Fax #: (609) 951-0044
Email: dgrodnick@firstam.com

Either Party hereto may change its address for notice by giving ten days prior notice thereof to the other party. The lawyers representing the Parties shall have the authority to give any notice required or authorized by this Agreement; and the authority to waive but only in writing, any notice or other communication required by this Agreement.

Section 18.    **Assigns/Beneficiaries.**  With the written consent of the other Party, either Party may assign its or their rights and obligations under this Agreement to a third party or parties and shall provide notice thereof to the other not later than five business days prior to the Closing Date; provided, however, that (i) Buyer may assign this Agreement without the consent of the Seller, to its parent, subsidiary, or Buyer Affiliate; and (ii) either Party may assign this Agreement without the consent of the other Party, to any qualified intermediary in connection with a tax deferred exchange under the Internal Revenue Code as amended ("Exchange"). "Buyer Affiliate" means (a) an entity which is a subsidiary of, or controlled by, the entity owning a controlling interest in Buyer, (b) any person or entity directly or indirectly controlling, controlled by or under common control with Buyer, (c) a person including a member of the family of such person, or entity, owning or controlling 50.00% or more of the equity interests in Buyer, or a subsidiary thereof, (d) any entity, directly or indirectly controlled by Peter O. Hanson, Donald Hanson or Stuart Alpert or any member of their immediate families, and (e) in the case of an assignment to more than one entity, one or more of the assignees meeting one of the criteria in the preceding clauses (a) through (d) is or is collectively acquiring at least at 50.00 percent undivided interest in the Property.

17

Section 19.   **Commissions.** Seller agrees to pay a sales commission at Closing to Marcus & Millichap (Craig Fuller) of Independence, Ohio and Ray Yung of Burnsville, Minnesota ("Broker"), pursuant to a separate written agreement. Seller and Buyer each severally represent and warrant to each other that, except for the Broker, they did not engage or use the services of any broker or finder in connection with this Agreement or the purchase and sale of the Property. Buyer and Seller agree to hold each other harmless and defend one another from claims made by or arising from any other broker or finder claiming by, under or through the indemnifying party.

Section 20.   **Computation of Time.** If the expiration date of any period or time for performance hereunder falls on a Saturday, Sunday, or legal or banking holiday in the State in which the Property is located, then, in such event, the expiration date of such period or time for performance shall be extended to the next business day.

Section 21.   **Governing Law.** This Agreement shall be governed and construed in accordance with the internal Law of the State in which the Property is located.

Section 22.   **Entire Agreement.** This Agreement is the entire agreement between Seller and Buyer concerning the sale of the Property, and except as provided in Section 31 below, no modification hereof or subsequent agreement relative to the subject matter hereof shall be binding on either party unless reduced to writing and signed by both parties. All Exhibits attached hereto are incorporated herein by this reference for all purposes.

Section 23.   **No Waiver.** No provision of this Agreement shall be deemed to have been waived by either party unless the waiver is in writing and signed by that party. No custom or practice which may evolve between the Buyer and Seller during the term of this Agreement shall be deemed or construed to waive or lessen the right of either of the parties hereto to insist upon strict compliance with the terms of this Agreement.

Section 24.   **No Recording.** Neither this Agreement nor any memorandum hereof shall be recorded in any public records where the Property is located or elsewhere.

Section 25.   **Attorney's Fees.** In the event of any litigation between the parties in connection with this Agreement, the prevailing party shall be entitled to recover their Litigation Expenses. The provisions of the immediately preceding sentence shall (i) survive any termination of this Agreement or the Closing and (ii) notwithstanding any other provision of this Agreement shall be in addition to and not in lieu of any other remedy of a party under this Agreement.

Section 26.   **Construction.** The parties acknowledge that this Agreement has been fully negotiated at arm's length and in good faith and that, if any ambiguity shall arise hereunder, there shall be no presumption that either party drafted this Agreement or shall have such ambiguity resolved against either party by virtue of its role in drafting or preparing this Agreement.

18

Section 27.   Tax Deferred Exchange.

(a):   Upon the request of a party, the other party shall cooperate to have the transaction contemplated by this Agreement treated as a "like kind exchange" pursuant to IRC Section 1031 and the regulations promulgated thereunder ("Exchange Requirements"); provided, however, that: (a) such cooperation shall be at no liability, cost or expense to the Party cooperating in such exchange ("Cooperating Party"); (b) the Outside Closing Date shall not be extended by reason thereof; (c) the Cooperating Party shall have no obligation to take title to any real property in connection with such exchange; and (d) the Cooperating Party shall make no representation or warranty in connection with, and shall have no responsibility for, compliance by such exchange with the Exchange Requirements, and the Cooperating Party shall have no obligation to indemnify, defend, or hold harmless the Exchangor. The party conducting the exchange shall have the right to assign its rights (but not its obligations) under this Agreement to a "qualified intermediary" as defined by the Exchange Requirements ("Exchangor"). If such party assigns its rights (but not its obligations) under this Agreement to an Exchangor, such party will give notice to the Cooperating Party of: (i) the assignment to the Exchangor; and (ii) that Exchangor is, and is only acting as, such party's qualified intermediary within the meaning of the Exchange Requirements.   Despite any assignment to an Exchangor, Seller shall convey the Property by direct deeding from Seller to Buyer.

(b) In the case of an exchange by the Buyer, Exchangor's liability under this Agreement shall be limited to the Earnest Money. No duty, obligation, representation or warranty of any Exchangor under this Agreement or any instrument delivered in connection with this Agreement or the transactions contemplated by this Agreement, shall survive the Closing, except for representations and warranties as to authority and as to dealings with brokers. Nothing in this Subsection shall relieve the party conducting the exchange from any liability or obligation under this Agreement.

Section 28.   Fax or E-Mail Documents.   The fax or e-mail transmission and receipt of this Agreement or a counterpart initial or signature page of this Agreement, or any amendment or other modification of this Agreement shall constitute the delivery of an original. Any document delivered by fax or e-mail must include the signature and initials as they appear on the original of this Agreement or any amendment or other modification of this Agreement or any counterpart of any of the foregoing.

Section 29.   Counterparts.   This Agreement may be signed in one or more counterparts and/or duplicate, faxed and/or pdf signature pages with the same force and effect as if all required signatures were contained in a single original instrument. Any one or more such counterparts, duplicate, faxed and/or pdf signature pages may be removed from any one or more original copies of this Agreement and annexed to other counterparts, duplicate, faxed or pdf signature pages to form a completely executed original instrument.

Section 30.   Partial Invalidity.   Each provision of this Agreement shall be construed as separable and divisible from every other provision and the enforceability of any one provision shall not limit the enforceability or applicability, in whole or in part, of any other provision of this Agreement. If a court of competent jurisdiction determines that any provision of this Agreement, or the application of any provision to any person or circumstances, shall to any extent be invalid or unenforceable, the provision

19

shall be construed by limiting and reducing the provision so as to be enforceable to the fullest extent possible under then applicable Law.

Section 31. **Attorneys' Authority.** Without the signature of either party, the attorneys for the parties may by an express agreement between the attorneys, evidenced in an exchange of correspondence, e-mails or letter agreement, shorten or extend any deadline in this Agreement, or modify or waive any provision of this Agreement in any instance or outright, and bind their respective clients for the purposes of agreeing in writing on exhibits or Closing documents not appended to this Agreement; provided, however, that the parties' attorneys shall have no authority to waive or modify any economic terms.

Section 32. **Future Assurances.** The parties agree that up to and after the date of Closing, they shall do such things and execute, acknowledge and deliver any and all additional instruments, documents and materials as either party may reasonably request to fully effectuate the purposes of this Agreement.

Section 33. **Patriot Act, Etc:**

(a) Each party severally ("Warranting Party") represents and warrants to the other party that (i) Warranting Party and each person or entity owning an interest in Warranting Party is (1) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "List"), and (2) not a person, entity or government with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, (ii) none of the funds or other assets of Warranting Party constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (defined below), (iii) no Embargoed Person has any interest of any nature whatsoever in Warranting Party (whether directly or indirectly), (iv) Warranting Party has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times. The term "Embargoed Person" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Warranting Party is prohibited by law or Warranting Party is in violation of law.

(b) Warranting Party also shall require, and shall take reasonable measures to ensure compliance with the requirement, that no person who owns any other direct interest in Warranting Party is or shall be listed on any of the Lists or is or shall be an Embargoed Person. This Section shall not apply to any person to the extent that such person's interest in the Warranting Party is through a U.S. Publicly-Traded Entity. As used in this Agreement, "U.S. Publicly-Traded Entity" means a person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a person.

(c) Warranting Party shall upon the request of the other party, deliver (from time to time and at Closing) to the other party any such certification or other evidence as may be reasonably requested by

the other Party, confirming that (x) neither Warranting Party nor any of Warranting Party's respective affiliated entities and persons is a Prohibited Person, and (y) Warranting Party has not engaged in any business, transaction or dealings with a Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person.

Section 34.  **Survival**:  All of the parties' obligations (i) under Sections 13 and 16 above, (ii) to indemnify, defend and hold the other party harmless; (iii) to pay the prevailing party's Litigation Expenses; and/or (iv) which are applicable to claims first discovered after the Closing, shall to the extent applicable, survive the termination of this Agreement and/or the Closing.

Section 35.  **Possession**.  The Buyer shall be entitled to possession on the Closing Date, subject to the Lease and the Permitted Encumbrances.

Section 36.  **"AS-IS, WHERE-IS."**  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN SECTION 8 OF THIS AGREEMENT AND THE DOCUMENTS TO BE DELIVERED AT CLOSING AND THE PROVISIONS OF THIS AGREEMENT AND DOCUMENTS TO BE DELIVERED AT CLOSING, BUYER ACKNOWLEDGES AND AGREES WITH SELLER THAT BUYER IS PURCHASING THE PROPERTY IN ITS "AS-IS, WHERE IS" CONDITION "WITH ALL FAULTS" AND DEFECTS AS OF THE CLOSING DATE AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED, AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, OR ANY OTHER WARRANTY OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER.  EXCEPT FOR THE REPRESENTATIONS OF SELLER EXPRESSLY SET FORTH IN SECTION 8 OF THIS AGREEMENT AND OTHERWISE SET FORTH IN THE CLOSING DOCUMENTS, SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, STRUCTURAL INTEGRITY, SOIL AND GEOLOGY; (B) THE INCOME TO BE DERIVED FROM THE PROPERTY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON, INCLUDING THE POSSIBILITIES FOR FUTURE DEVELOPMENT OF THE PROPERTY; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY; (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (H) THE PRESENCE OR ABSENCE OF HAZARDOUS MATERIALS AT, ON, UNDER, OR ADJACENT TO THE PROPERTY OR ANY OTHER ENVIRONMENTAL MATTER OR CONDITION OF THE PROPERTY; OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY.  BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN SECTION 8 OF THIS AGREEMENT, ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER WITH RESPECT TO THE

PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.  SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON EXCEPT FOR THE EXPRESS REPRESENTATIONS SET FORTH IN SECTION 8 OF THIS AGREEMENT AND THE CLOSING DOCUMENTS.  BUYER FURTHER ACKNOWLEDGES AND AGREES THAT BUYER IS A SOPHISTICATED AND EXPERIENCED BUYER OF PROPERTIES SUCH AS THE PROPERTY AND HAS BEEN DULY REPRESENTED BY COUNSEL IN CONNECTION WITH THE NEGOTIATION OF THIS AGREEMENT.

Section 37.  **Buyer's Representations and Warranties.**  Buyer hereby represents and warrants to Seller, which shall be true and correct as of the Effective Date and the Closing Date:

(a)     Buyer is validly formed and subsisting under the laws of the State of Buyer's formation;

(b)     The purchase of the Property from Seller and the performance of this Agreement will not result in any breach of, or constitute a default under, any instrument to which Buyer is a party or by which Buyer may be bound or affected; and

(c)     Buyer has full right, power, and authority to execute and deliver this Agreement and to consummate the Closing without obtaining any further consents or approvals from, or the taking of any other actions with respect to, any third parties; and this Agreement, when executed and delivered by Seller and Buyer, will constitute the valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms.

[signatures on following page]

22

KERR DRUG STORE, NASHVILLE NC
PURCHASE AND SALE AGREEMENT SIGNATURE PAGE

**SELLER:**

MINT HILL/KERR/NASHVILLE, LLC
a Delaware limited liability company

By:    MINT HILL, LLC, a North Carolina limited liability company,
       its sole member

By:
Name:  Mark Bozzone
Title: Managing Member
Date:  3/14/14

**BUYER:**

SPC ACQUISITION COMPANY LLC
a New Jersey limited liability company as nominee
By: Roebling Investment Company, Inc.
Title: Managing Member

By:
Name:  Donald Hanson
Title: President
Date:

**TITLE COMPANY** with respect to the duties of Title Company with respect to
the Earnest Money above:

First American Title Insurance Company

By:
Name:
Title:
Date:

23

KERR DRUG STORE, NASHVILLE NC
PURCHASE AND SALE AGREEMENT SIGNATURE PAGE

SELLER:

MINT HILL/KERR/NASHVILLE, LLC
a Delaware limited liability company

By:   MINT HILL, LLC, a North Carolina limited liability company,
      its sole member

By: _____
Name: Mark Bozzone
Title: Managing Member
Date: _____

BUYER:

SPC ACQUISITION COMPANY LLC
a New Jersey limited liability company as nominee
By: Roebling Investment Company, Inc.
Title: Managing Member

By: _____
Name: Donald Hanson
Title: President
Date: 3 / 17 / 14

TITLE COMPANY with respect to the duties of Title Company with respect to
the Earnest Money above:

First American Title Insurance Company

By: _____
Name: Melanie Chirocello
Title: Commercial Underwriter
Date: 3 / 18 / 04

23

EXHIBIT A

LEGAL DESCRIPTION OF LAND

(Nashville #514, Nash County)

*BEING ALL THAT PIECE OR PARCEL OF LAND LYING AND BEING SITUATE IN THE TOWN OF NASHVILLE, COUNTY OF NASH, STATE OF NORTH CAROLINA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:*

*BEGINNING AT AN EXISTING IRON PIPE ON THE SOUTHERN RIGHT-OF-WAY OF WASHINGTON STREET, SAID POINT BEING ON THE WESTERN LINE OF TRACT 2, PIEDMONT CENTER INVESTMENTS, LLC PROPERTIES AS RECORDED IN DEED BOOK 1702, PAGE 530 OF THE NASH COUNTY REGISTRY; THENCE WITH SAID WESTERN LINE SOUTH 40°47'49" WEST 205.09 FEET TO AN EXISTING SEWER MANHOLE; THENCE SOUTH 40°47'49" WEST 56.99 FEET TO AN EXISTING REBAR ON THE NORTHERN LINE OF TRACT 3, H. WATSON BYRD, KATIE S. BYRD AND VICKIE D. BYRD AS RECORDED IN DEED BOOK 1336, PAGE 126 OF THE NASH COUNTY REGISTRY; THENCE WITH SAID NORTHERN LINE NORTH 49°12'11" WEST 207.14 FEET TO AN IRON PIPE SET ON THE EASTERN RIGHT-OF-WAY OF CHURCH STREET; THENCE WITH SAID RIGHT-OF-WAY THE FOLLOWING TWO CALLS: 1) NORTH 41°46'30" EAST 236.07 FEET TO AN EXISTING IRON PIPE; THENCE 2) NORTH 89°03'44" EAST 16.40 FEET TO AN EXISTING IRON PIPE ON THE SOUTHERN RIGHT-OF-WAY OF WASHINGTON STREET; THENCE WITH SAID RIGHT-OF-WAY THE FOLLOWING TWO CALLS: 1) SOUTH 54°45'08" EAST 125.99 FEET TO AN IRON PIPE SET; THENCE 2) SOUTH 51°46'37" EAST 65.54 FEET TO THE TRUE POINT AND PLACE OF BEGINNING CONTAINING 1.20 ACRES MORE OR LESS.*

*BEING THE SAME PROPERTY AS SHOWN AS TRACT 1 ON MAP BOOK 27, PAGE 244 AS RECORDED IN THE NASH COUNTY REGISTRY.*

EXHIBIT A-1

SURVEY MAP

[attached]



EXHIBIT B

ESCROW AGREEMENT

DUTIES OF ESCROW AGENT AND FDIC WAIVER:

1.  Deposit of Funds.   Buyer shall deposit with Title Company ("Escrow Agent") the Earnest Money described in the attached Purchase Agreement (Collectively the "Funds"), and Escrow Agent shall receive and hold the Funds in an interest bearing account with _____ so long as it is an FDIC insured bank, or other FDIC insured Bank of Escrow Agent's choosing.   Interest on said account shall become part of the Earnest Money, Buyer's Tax Identification Number for the reporting of interest on said account will be as set forth in the Form W-9 Buyer provides Escrow Agent,

2.  Disbursement of Funds. Funds shall be disbursed as provided in the Purchase Agreement,

3.  Liability.  The parties agree that Escrow Agent shall have no liability under this Escrow Agreement except to account for the Funds as specified herein, serve without negligence, not violate the terms and conditions of the Purchase Agreement applicable to the Escrow Agent, and not violate written instructions given by either or both parties.  Without limiting the generality of the foregoing, Escrow Agent shall not be liable for any loss or damage resulting from any of the following:

(a)  Any defects or conditions of title to any property, except those resulting from Escrow Agent's own wrongful acts, or insured against by a title insurance policy of First American Title Insurance Company which is issued or to be issued.  No title insurance liability is created by this Escrow Agreement,

(b)  Any defects in the property purchased, obligations or rights of any tenant or other party in possession, the surrender of possession or any misrepresentations made by any other party.

(c)  Legal effect of any instrument exchanged by the parties hereto,

(d)  Any default, error, action or omission of any other party,

(e)  The expiration of any time limit or other delay, unless such time limit was known to Escrow Agent, Escrow Agent was obligated to comply therewith, and such loss is solely caused by failure of Escrow Agent to proceed in its ordinary course of business,

(f)  Any good faith act or forbearance by Escrow Agent,

(g)  Any loss or impairment of the Funds deposited in escrow in the course of collection or while on deposit with a FDIC insured trust company, bank, savings bank or savings association resulting from failure, insolvency or suspension of such institution or while in transit by wire transfer or otherwise.

(h)  Escrow Agent complying with any and all legal process, writs, orders, judgments and decrees of any court, whether issued with or without jurisdiction, and whether or not subsequently vacated, modified, set aside or reversed,

(i)  Escrow Agent asserting or failing to assert any cause of action or defense in any judicial, administrative, or other proceeding either in the interest of itself or any other party or parties,

26

Upon disbursement of all Funds in accordance with the Purchase Agreement or the written Instructions of both parties, or to a court of competent jurisdiction in an interpleader action, Escrow Agent shall be relieved of all further liability and responsibility in connection with the Escrow Agreement or this escrow.

4. <u>Time Limit.</u> In the event that the Escrow Agent has not been given written instructions to disburse the Funds on or before date of closing defined in the Purchase Contract, then the Escrow Agent shall make inquiry of the Buyer's legal counsel as to the disposition of the Funds. Unless disposition of the Funds is agreed upon in writing at that time by Buyer and Seller, Escrow Agent may be entitled to either interplead the Funds as described in paragraph 9 herein or continue to hold the Funds to wait for joint written instructions from Buyer and Seller, which choice is at Escrow Agent's sole and absolute discretion.

5. <u>Methods of Funds Transfer.</u> Escrow Agent may transfer the Funds by corporate check, by wire transfer, by certified or cashier's check, or by such other means as may be agreed upon in writing.

6. <u>Release.</u> The parties agree that Escrow Agent shall have no liability under this Escrow Agreement except to account for the Funds as provided herein, serve without negligence, not violate the terms and conditions of the Purchase Agreement applicable to the Escrow Agent, and not violate written instructions given by both parties. The endorsement, acceptance, or negotiation of such funds shall constitute a full and complete release by such party of the Escrow Agent from any and all liability of any kind or nature whatsoever in connection with this Escrow Agreement or the escrow.

7. <u>Indemnity.</u> Buyer and Seller ("Indemnitors") jointly and severally hereby agree to release, hold harmless and indemnify the Escrow Agent from and against any liability, cost or expense, including attorney fees and court costs, incurred by it in connection with any arbitration or court action, or any act taken within the scope of this Escrow Agreement or any failure to act, unless due to the negligence or misconduct of the Escrow Agent, or its failure to comply with the terms and conditions of the Purchase Agreement applicable to the Escrow Agent, or written instructions given by both parties.

In furtherance, and not in limitation of the foregoing, Indemnitors agree as follows, which agreement shall survive the disbursement of all Funds in the escrow account: Indemnitors shall not hold Escrow Agent responsible in any manner for, and Indemnitors shall reimburse and indemnify the Escrow Agent for and hold Escrow Agent harmless against, any loss liability or expense arising out of, or in connection with Escrow Agent's acceptance of or Escrow Agent's performance of its duties hereunder as well as the reasonable costs and expenses of defending against any claim or liability arising out of, or relating to, this Escrow Agreement, unless due to the negligence or misconduct of the Escrow Agent, or its failure to comply with the terms and conditions of the Purchase Agreement applicable to the Escrow Agent, or written instructions given by both parties.

8. <u>Termination of Liability.</u> Upon disbursement of all Funds in accordance with the Purchase Agreement or the written instructions of both parties, or to a court of competent jurisdiction in an interpleader action, Escrow Agent shall be relieved of all further liability and responsibility in connection with the Escrow Agreement or this escrow.

9. <u>Interpleader.</u> In the event any demand is made upon Escrow Agent concerning this Escrow Agreement or this Escrow, or at any time, Escrow Agent, at its election and in its sole discretion, may cause the Funds to be delivered to a court of competent jurisdiction to determine the rights of Seller and Buyer, or to interplead Seller and Buyer by an action brought in any such court. Deposit by Escrow Agent into such court of the Funds shall relieve Escrow Agent of all further liability and responsibility in connection with this Escrow Agreement and the Escrow.

10. FDIC Waiver.  The Buyer hereby certifies that he/she/it/they are aware that the Federal Deposit Insurance Corporation (FDIC) coverages apply only to the cumulative maximum amount of $100,000.00 for each individual depositor for all of depositor's accounts at the same or related institution. Buyer further understands that certain banking instruments such as, but not limited to, repurchase agreements and letters of credit are not covered at all by FDIC Insurance. First American Title Insurance Company assumes no responsibility for, nor will it be held liable, for any loss occurring which arises from the fact that the amount of the above account may cause the aggregate amount of any individual depositor's accounts to exceed $100,000.00 and that the excess amount is not insured by the Federal Deposit Insurance Corporation or that FDIC Insurance is not available on certain types of bank instruments.

11. Return of Earnest Money Deposit.  Despite any other provision of these Instructions to the contrary, if the Buyer does not give the Due Diligence Approval Notice by the end of the Due Diligence Period as provided in Section 6 of the Purchase Agreement, Escrow Agent shall refund the Funds to the Buyer, despite any demand, objection, notice or other communication from the Seller, unless the Escrow Agent receives written instructions from both Seller and Buyer to the contrary.

28

## EXHIBIT C

### Form of REA Estoppel

_____, 201__

[Buyer and Lender]:

Re:_____

    The undersigned, as _____ ("Owner") under that certain Declaration of Reciprocal Easements between _____, a _____, and _____, a _____ ("Seller"), dated _____, as amended by _____, that certain _____ (collectively the "REA"), covering the premises described therein and referenced above, hereby states:

1.    The REA is in full force and effect and has not been amended or modified.

2.    As of this date, to the best of Owner's knowledge, neither Owner or Seller is in default, breach or violation under the REA; and there is no outstanding notice alleging any default, breach of violation under the REA.

3.    Any notice or other communication to be given to the Owner pursuant to the Declaration, is to be addressed as follows:_____

OWNER:

_____

By:_____
Name:_____
Title:_____

29

**EXHIBIT D**

Form of Assignment and Assumption of Lease

## ASSIGNMENT OF LEASE

THIS ASSIGNMENT OF LEASE is made as of the _____ day of _____, 2013, by_____, a _____ limited liability company having a place of business at _____ ("Assignor") in favor of _____, a _____ having a place of business at _____ ("Assignee"),

## WITNESSETH:

WHEREAS, Assignor owns title to that certain real property located in _____ County, _____, more particularly described on Exhibit A attached hereto and made a part hereof by reference (the "Property");

WHEREAS, Assignor, as landlord, is party to a certain lease dated _____, 20___, as amended on _____, 20___, between Assignor and _____ (collectively, the "Lease");

WHEREAS, pursuant to that certain Guaranty of the Lease dated February 12, 2014 (the "Guaranty"), Walgreen Co. guarantied the Lease;

WHEREAS, Assignor now wishes to assign all of the right, title and interest in and to the Lease attributable to periods from and after the time and execution of this Agreement and to assign all of its right, title and interest in and to all rent due under such Lease to Assignee, and to assign its obligations under the Lease attributable to periods from and after the time of execution and delivery of this Agreement, and assign its right, title and interest under the Guaranty, to Assignee, who wishes to accept such assignment and assume such obligations,

FOR AND IN CONSIDERATION OF the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of these premises, the parties, with the intent to be legally bound, hereby agree as follows:

1. Assignor hereby assigns, grants, conveys and transfers to the Assignee, its successors and assigns, the Lease and the Guaranty, together with all of landlord's legal and beneficial right, title, interest and estate in and to said Lease and Guaranty.

30

2.   Assignor represents and warrants that it has full and complete right to assign said Lease to Assignee and that this Assignment will not cause a default or breach under said Lease. Assignor represents and warrants that its interest in said Lease is not encumbered or subject to any claim or offset and that no other assignment of the Lease or the rents and profits derived therefrom is in effect.

3.   Assignee assumes the performance of all of the obligations of Assignor first arising or accruing under the Lease from and after the date hereof. Assignee agrees to indemnify, protect, defend and hold Assignor harmless from and against any and all claims, demands, liabilities, losses, costs, damages or expenses including, without limitation, reasonable attorneys' fees and costs (collectively, "Claims") arising as a result of any act, omission or obligation of Assignee arising or accruing with respect to the Lease after the date hereof, including, without limitation, any breach of the obligations of the Assignee in this assignment; provided, however, that Assignee shall have no obligation to provide any indemnification or defense for any injury, damage or conduct occurring prior to the date hereof.

4.   Assignor shall comply with all obligations of landlord under said Lease through the date of this assignment. Assignor hereby agrees to indemnify, protect, defend and hold Assignee harmless from and against any and all Claims arising as a result of any act, omission or obligation of Assignor arising or accruing with respect to the Lease prior to the date hereof, including, without limitation, any breach of the obligations of the Assignor in this assignment.

5.   In the event of any litigation arising out of or under this assignment, the prevailing party shall be entitled to collect from the non-prevailing party reasonable attorneys' fees and costs, including at all appellate levels and in any bankruptcy proceeding.

6.   This assignment shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors, assigns and legal representatives.

7.   This assignment may not be amended or modified nor may any provision be waived, except in a writing signed by the party against whom enforcement is sought.

8.   This assignment may be executed in any number of counterparts any one of which shall constitute an original hereof. When counterparts have been executed by all parties, they shall have the same effect as if the signature thereto and hereto were upon the same document. The parties agree that all such signatures may be transferred to a single document for the purposes of convenience and/or recording.

   IN WITNESS WHEREOF, Assignor has caused this Instrument to be executed and sealed as of the day and year first above written.

ASSIGNOR:

ASSIGNEE:

31

**EXHIBIT E**

Form of Notice of Sale to Tenant

<u>**NOTICE TO TENANT**</u>

<u>VIA NEXT BUSINESS DAY COURIER & FAX (____)</u> :

_____, 201__

_____
_____
_____

Re:   Lease dated _____, 20___ (as amended, modified and supplemented from time to time, the "Lease") by and between _____ ("Landlord") and _____ ("Tenant") concerning the Demised Premises known as Store No. _____ located at _____ in the _____ of _____, _____, _____

Dear Tenant:

Please be advised that, as of the date set forth above, Landlord's interest in the Lease and the Demised Premises were sold and transferred to _____, a _____ ("New Owner") and New Owner mortgaged the Demised Premises to _____ ("Lender"). The Federal Taxpayer Identification No. for _____ is _____.

Enclosed with this notice are copies of:

1. A Form W-9 for New Owner;
2. The deed to New Owner;
3. The assignment of the Lease to New Owner; and
4. The SNDA among Tenant, New Owner and Lender

New Owner hereby instructs and authorizes Tenant to make all payments of rent and additional rent, payable to "_____ LLC" and deliver such payments to:

_____
_____
_____

32

New Owner hereby instructs and authorizes Tenant to hereafter deliver all notices, requests and communications to:

> NAI Hanson Management LLC
> 235 Moore Street, Suite 102
> Hackensack, NJ 07601
> Attn: Ivette Correa
> Telephone No.: (201) 488-5800 x 157
> Facsimile No.: (201) 646-1399

A copy of each of the notices, requests and other communications to the landlord are to be delivered to:

> Stuart Alpert
> Keller Realty
> 90 State Street
> Hackensack, NJ 07601
> Telephone No.: (201) 488-4500
> Facsimile No.: (201) 488-2570

Any informal notice or request may be sent by email to Ms. Correa at: ICorrea@naihanson.com

Any notice to the Lender should be addressed as follows:

> _____
> _____
> _____
> _____

Within 15 days after Tenant's receipt of this notice, please provide the New Owner and Lender with insurance certificates reflecting the coverage required of Tenant under the Lease in favor of New Owner and Lender, as applicable.

This notice may be signed in counterparts with the same effect as if all signatures were contained in a single fully executed notice.

Very truly yours

[signatures on following page]

33

## EXHIBIT F

### Form of Bill of Sale and Miscellaneous Assignment

### BILL OF SALE AND MISCELLANEOUS ASSIGNMENT

For $10.00 in hand paid, and other and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, this Bill of Sale and Miscellaneous Assignment ("Assignment") is entered into and made effective as of _____, 201___, by and between _____ LLC, a _____ limited liability company ("Assignor") and _____, a _____ limited liability company ("Assignee").

1. To the extent assignable by Assignor and not already assigned to _____ pursuant to the Lease Agreement dated _____, 20____, as amended, Assignor hereby irrevocably assigns, transfers, sets over and conveys to Assignee all of the following, which assignment Assignee hereby accepts and assumes all of the rights, title, interest, powers, privileges, benefits and options of Assignor in and to all intangible personal property, owned, licensed or otherwise held by Assignor, if any, that is used solely in connection with the real estate located at _____ in _____ County, _____, as more fully described on Exhibit A attached hereto, and sold this date by Assignor to Assignee (the "Property and Improvements"), including without limitation intended:

a. All of the rights, title, interest, powers, privileges, benefits and options of Assignor, if any, in, to and under all warranties and agreements from any and all contractors, subcontractors, vendors, service-providers or material suppliers regarding their performance, quality of workmanship or quality of materials supplied in connection with the construction, manufacture, development, installation, repair, maintenance or operation of the Property and Improvements, and in, to and under all other warranties, guaranties, indemnities and contracts relating to the Property and Improvements; and

b. All of the rights, title, interest, powers, privileges, benefits and options of Assignor, if any, in and to all plans, drawings, specifications, surveys, engineering reports and other technical information, certificates, licenses, permits, authorizations, consents and approvals from governmental authorities with respect to Property and Improvements.

2. The prevailing party in any dispute arising out of this Assignment shall be entitled to payment of their reasonable attorneys' fees and expenses.

3. This Assignment may be executed in any number of counterpart signatures. Fax, pdf or photostatic copies of this Assignment or counterparts shall have the same effect as originals.

4. No modification, waiver, amendment, discharge or change of this Assignment shall be valid unless the same is in writing and signed by the parties hereto.

34

5.   This assignment shall be binding upon and inure to the benefit of the parties' successors-in-interest.

[Signatures on next page]

ASSIGNOR:

_____

BY: _____
NAME: _____
ITS: _____

ASSIGNEE:

_____

BY: _____
NAME: _____
ITS: _____

36

## SCHEDULE 5

### List of Due Diligence Items

1. Guaranty of Walgreen Co. dated February 12, 2014

2. Lease between NLA KD Nashville LLC and Kerr Drug, Inc. dated July 1, 2005

3. Assignment of Leases and Security Deposits dated September 12, 2005

4. Assignment and Assumption of Acquired Leases dated September 23, 2013

5. North Carolina Special Warranty deed dated September 12, 2005 from NLA KD Nashville LLC to Mint Hill/Kerr/Nashville, LLC

6. Tax Bills

7. Phase I Environmental Site Assessment dated March 31, 2005 (the "ESA")

8. Accord Certificate of Property Insurance dated May 14, 2013

9. Survey dated March 28, 2005

10. Owner's Policy dated September 13, 2005

11. Property Condition Assessment dated March 31, 2005 (the "PCA")

12. Zoning Certification dated March 21, 2005

13. Certificate of Occupancy dated September 2, 1997

# **EXHIBIT 2**



**Buchanan Ingersoll & Rooney** PC
Attorneys & Government Relations Professionals

One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA  15219-1410

T 412 562 8800
F 412 562 1041
www.buchananingersoll.com

**Jason P. Wrona**
412 562 3920
jason.wrona@bipc.com

March 25, 2014

**VIA UPS AND E-MAIL (dhanson@ric.net)**

Attn: Donald L. Hanson
SPC Acquisition Company LLC.
235 Moore Street, Suite 304
Hackensack, NJ  07601

      Re:      Purchase and Sale Agreement dated as of March 18, 2014 ("Agreement"), between Mint Hill/Kerr/Nashville, LLC, a Delaware limited liability company ("Seller"), and SPC Acquisition Company LLC, a New Jersey limited liability company ("Buyer")

Dear Mr. Hanson:

      Please be advised that Buchanan Ingersoll & Rooney PC represents Seller with respect to the above-referenced matter.  Capitalized terms used herein have the meaning ascribed thereto in the Agreement.

      This letter constitutes a Notice of Breach to you pursuant to Section 16 of the Agreement.  In particular, Buyer has not delivered the First Deposit to the Title Company within three business days after the Effective Date, as required by Section 4 of the Agreement.

      As provided in Section 16(a) of the Agreement, Buyer has ten (10) days from the date of this Notice of Breach in which to cure this material breach.

      Please have your attorney advise me of the status of your remedial actions with respect to this matter as soon as possible.

                Very truly yours,

                Jason P. Wrona

cc:     Scott Irmscher (via e-mail)
        Mark Tipperman (via UPS and e-mail – mark@relawyer.org)
        David Grodnick, Esquire, First American Title Insurance Company (via UPS and e-mail –
        dgrodnick@firstam.com)
        Mark Bozzone (via e-mail – mark@baydevco.net)

# **<u>EXHIBIT 3</u>**

**Buchanan Ingersoll ⅍ Rooney** PC
Attorneys & Government Relations Professionals

One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410

**Jason P. Wrona**
412 562 3920
jason.wrona@bipc.com

T 412 562 8800
F 412 562 1041
www.buchananingersoll.com

April 21, 2014

**VIA UPS AND E-MAIL (dhanson@ric.net)**

Attn: Donald L. Hanson
SPC Acquisition Company LLC.
235 Moore Street, Suite 304
Hackensack, NJ 07601

Re:     Purchase and Sale Agreement dated as of March 18, 2014 ("Agreement"), between Mint Hill/Kerr/Nashville, LLC, a Delaware limited liability company ("Seller"), and SPC Acquisition Company LLC, a New Jersey limited liability company ("Buyer")

Dear Mr. Hanson:

Please be advised that Buchanan Ingersoll & Rooney PC represents Seller with respect to the above-referenced matter. Capitalized terms used herein have the meaning ascribed thereto in the Agreement.

This letter constitutes a Notice of Breach to you pursuant to Section 16 of the Agreement. In particular, Buyer has not delivered the Second Deposit to the Title Company within three (3) business days after the end of the Due Diligence Period, as required by Section 4 of the Agreement.

As provided in Section 16(a) of the Agreement, Buyer has five (5) business days from the date of this Notice of Breach in which to cure this material breach.

Please have your attorney advise me of the status of your remedial actions with respect to this matter as soon as possible.

Very truly yours,

Jason P. Wrona

cc:     Scott Irmscher (via e-mail)
        Mark Tipperman (via UPS and e-mail – mark@relawyer.org)
        David Grodnick, Esquire, First American Title Insurance Company (via UPS and e-mail – dgrodnick@firstam.com)
        Mark Bozzone (via e-mail – mark@baydevco.net)

# **<u>EXHIBIT 4</u>**

## Buchanan Ingersoll ∧ Rooney PC
Attorneys & Government Relations Professionals

**Jason P. Wrona**
412 562 3920
jason.wrona@bipc.com

One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA  15219-1410
T 412 562 8800
F 412 562 1041
www.buchananingersoll.com

June 9, 2014

**VIA UPS (OVERNIGHT) AND E-MAIL (dhanson@ric.net)**

Attn: Donald L. Hanson
SPC Acquisition Company LLC.
235 Moore Street, Suite 304
Hackensack, NJ  07601

      Re:     Purchase and Sale Agreement dated as of March 18, 2014 ("Agreement"), between Mint Hill/Kerr/Nashville, LLC, a Delaware limited liability company ("Seller"), and SPC Acquisition Company LLC, a New Jersey limited liability company ("Buyer")

Dear Mr. Hanson:

      Please be advised that Buchanan Ingersoll & Rooney PC represents Seller with respect to the above-referenced matter.  Capitalized terms used herein have the meaning ascribed thereto in the Agreement.

      This letter constitutes a Notice of Breach to you, pursuant to Section 16 of the Agreement, of the following material breaches by Buyer:

    1.     By the enclosed e-mail from Buyer's counsel sent April 30, 2014, Buyer elected to extend the Outside Closing Date from May 7, 2014 to June 6, 2014, pursuant to Section 10 of the Agreement.  Buyer has not delivered the additional Earnest Money deposit in the amount of $100,000.00, as required by Section 10 of the Agreement.

    2.     Although Seller has satisfied all conditions to Closing applicable to Seller set forth in Section 9, Section 10 or in any other provision of the Agreement, including, without limitation, delivering all of Seller's closing documents into escrow with the Title Company on June 5, 2014, Buyer did not complete the Closing by the Outside Closing Date of June 6, 2014.

      As provided in Section 16(a) of the Agreement, Buyer has five (5) business days from the date of this Notice of Breach in which to cure these material breaches.  In the event that Buyer has failed to tender to Purchase Price and complete the Closing on or before June 16, 2014, this letter shall constitute Seller's notice of termination of the Agreement and instructions to the Title Company to promptly deliver all Earnest Money to Seller, as required by Section 16(b) of the Agreement.  In the meantime, Seller is ready, willing and able to proceed to Closing.

I0289604

June 9, 2014
Page 2

      Please have your attorney advise me of the status of your remedial actions with respect to this matter as soon as possible.

Very truly yours,

Jason P. Wrona

JPW/mas

cc:    Scott Irmscher (via e-mail)
       Mark Tipperman (via UPS and e-mail: mark@relawyer.org)
       David Grodnick, Esquire, First American Title Insurance Company (via UPS and e-mail: dgrodnick@firstam.com)
       Mark Bozzone (via e-mail: mark@baydevco.net)

10289604

# **<u>EXHIBIT 5</u>**

## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

THIS FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "Amendment") is entered into June 20, 2014, to be effective as of June 6, 2014, by and between Mint Hill/Kerr/Nashville, LLC, a Delaware limited liability company ("Seller"), and SPC Acquisition Company LLC, a New Jersey limited liability company, as nominee for one or more limited liability companies to be formed ("Buyer").

WITNESSETH:

WHEREAS, Seller and Buyer entered into that certain Purchase and Sale Agreement dated as of March 18, 2014 (the "Purchase Agreement"), whereby Seller agreed to convey to Buyer and Buyer agreed to purchase from Seller that certain tract or parcel of land located at 703 East Washington Street, Nashville, Nash County, North Carolina, as more specifically described and subject to the terms and conditions in the Purchase Agreement; and

WHEREAS, Buyer elected to extend the Outside Closing Date from May 7, 2014 to June 6, 2014 pursuant to Section 10 of the Purchase Agreement, but has not delivered the additional Earnest Money deposit in the amount of $100,000.00 (the "Additional Earnest Money Deposit"), as required by Section 10 of the Agreement; and

WHEREAS, Buyer has requested that Seller agree to further extend the Outside Closing Date from June 6, 2014 to July 14, 2014, and Seller has agreed to such extension, subject to the terms and conditions set forth in this Amendment.

NOW, THEREFORE, in consideration of mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    Recitals.  Seller and Buyer acknowledge the truth and accuracy of the foregoing recitals, which are hereby incorporated as if fully set forth herein.

2.    Defined Terms.  All capitalized terms used in this Amendment and not otherwise defined in this Amendment shall have the same meanings ascribed thereto in the Purchase Agreement.

3.    Performance of Seller Obligations.  Buyer acknowledges and agrees that, as of the date hereof and subject to completion of the Closing, delivery of title to the Property in accordance with the Purchase Agreement and Seller's performance of the actions specified in this Section 3, Seller has to the best of Buyer's knowledge, (a) completely and satisfactorily performed all obligations of Seller under the Purchase Agreement and (b) has completely satisfied all conditions to Closing to be satisfied by Seller set forth in Section 9, Section 10 or in any other provision of the Agreement, including, without limitation, Seller's delivery into escrow with the Title Company of executed originals of the following instruments: the Tenant Estoppel; the Lease Subordination, Non-disturbance and Attornment Agreement ("SNDA") (Seller will request in writing that the tenant under the Lease Agreement extend the 30-day period of time for return of the fully executed SNDA until July 12, 2014, provided, however, that the tenant's

1

10290302

agreement to extend such period is not a condition to Closing); the Deed (after revised consistent with the final revised Deed attached to this Amendment as Exhibit "A", to which revised Deed we authorize Title Company to attach Seller's notarized signature page at Closing); the Lease Assignment; the Sale Notice (Page 2 to be revised to insert mailing and wire instructions for rent payments, if Buyer timely furnishes the information prior to Closing); the Bill of Sale and Miscellaneous Assignment; the FIRPTA Certificate; and any other documents, instruments, agreements, certificates, materials or evidence required by Buyer or the Title Company. Prior to Closing, Seller shall deliver to the Title Company: (i) any organizational consent, incumbency certificate, operating agreement or the like that the Title Company may reasonably require; (ii) Seller's signature on the final version of the settlement statement that is acceptable to Seller; (iii) any return or form required of a seller under North Carolina law to record the Deed; and (iv) certified copies of the original Lease Agreement and Lease Guaranty for delivery to Buyer upon the completion of Closing.

4.     Outside Closing Date Extension.  In consideration for the Purchase Price Increase (as defined below) and Buyer's payment of the Additional Earnest Money Deposit, the parties hereby agree to extend the Outside Closing Date from June 6, 2014 to July 14, 2014.

5.     Purchase Price Increase.  The parties hereby agree to increase the Purchase Price by Twenty Thousand and 00/100 Dollars ($20,000.00) (the "Purchase Price Increase") from $3,968,790.00 to $3,988,790.00. Buyer shall, consistent with the terms of Section 7 below, pay directly to Seller an amount equal to the Purchase Price Increase (the "Purchase Price Payment"). At the Closing the Purchase Price Payment will be credited against the Purchase Price and will otherwise be non-refundable, except in the event the transactions contemplated by the Purchase Agreement fail to close due solely to Seller's Default, in which event Seller shall refund to Buyer the Purchase Price Payment.

6.     Additional Earnest Money Deposit.  Buyer shall, consistent with the terms of Section 7 below, deposit with the Title Company the Additional Earnest Money Deposit.

7.     Buyer Payments.  Buyer shall pay to Seller the Purchase Price Payment by wire transfer of funds to an account (the "Account") designated by Seller pursuant to wire instructions attached to this Amendment as Exhibit "B." Buyer shall deliver the Purchase Price Payment and Additional Earnest Money Deposit by Federal Reserve System wire transfers no later than 5:00 p.m. EDST on June 23, 2014 (the "Payment Deadline"), time being of the essence. Notwithstanding anything to the contrary in this Amendment or the Purchase Agreement, Buyer and Seller acknowledge and agree that if either or both of the Purchase Price Payment or Additional Earnest Money Deposit are not timely received as set forth in the preceding sentence, then Buyer shall automatically and immediately be in material breach and default of the Purchase Agreement (a "Payment Default"), without opportunity for Buyer to cure the Payment Default. Buyer and Seller further acknowledge and agree that upon Seller's written notice to the Title Company and Seller of a Payment Default, the Title Company shall promptly deliver all Earnest Money to Seller without any obligation on behalf of Seller or the Title Company to obtain any additional consent of Buyer to such payment of Earnest Money, unless within one business day after Seller's written notice of Payment Default is given, Buyer (i) delivers to Title Company written confirmation(s) with the Federal Reserve System wire transfer reference numbers and the date of the wires, from the bank(s) that transmitted the Purchase Price Payment and Additional

Earnest Money Deposit and (ii) the dates of the wires are on or before the Payment Deadline, evidencing that the Purchase Price Payment was made to the Account and that the Additional Earnest Money Deposit was paid to Title Company on or before the Payment Deadline. Seller's receipt of the Earnest Money, in the event of a Payment Default or any other breach or default by Buyer under the Purchase Agreement, shall not be deemed a waiver of Seller's right and entitlement to the Purchase Price Payment or Additional Earnest Money Deposit or any other rights and remedies of Seller under the Purchase Agreement.

8.    Savings Clause.  Except as specifically modified by this Amendment, all of the terms, covenants and conditions of the Purchase Agreement shall remain in full force and effect and are hereby ratified and affirmed by the parties hereto.

9.    Conflict.  In the event of a conflict between any provision of this Amendment and the Purchase Agreement, the terms and conditions of this Amendment shall govern and control.

10.    Counterparts.  This Amendment may be executed in any number of counterparts, and each party may furnish its signature via electronic transmission, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute only one original.

[SIGNATURE PAGE FOLLOWS]

3

[SIGNATURE PAGE -- FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed on the date first written above.

SELLER:

MINT HILL/KERR/NASHVILLE, LLC,
a Delaware limited liability company

By:   MINT HILL, LLC, a North Carolina
      limited liability company, its sole member

By:   _____
Name: Mark Bozzone
Title: Managing Member

BUYER:

SPC ACQUISITION COMPANY LLC,
a New Jersey limited liability company as nominee

By: Roebling Investment Company, Inc.
Title: Managing Member

By:   _____
Name: Donald Hanson
Title: President

ACKNOWLEDGED AND AGREED:

FIRST AMERICAN TITLE INSURANCE
COMPANY

By:   _____
Name: DAVID B. GRODNICK
Title: VICE PRESIDENT

4

10290302

06-20-14;03:15PM;                                                    ;                          # 4/ 6

[SIGNATURE PAGE – FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed on the date first written above.

**SELLER:**

**MINT HILL/KERR/NASHVILLE, LLC,**
a Delaware limited liability company

By:     MINT HILL, LLC, a North Carolina
        limited liability company, its sole member


By:     _____
Name:   Mark Bozzone
Title:  Managing Member


**BUYER:**

**SPC ACQUISITION COMPANY LLC,**
a New Jersey limited liability company as nominee

By: Roebling Investment Company, Inc.
Title: Managing Member


By:     _____
Name:   Donald Hanson
Title:  President


ACKNOWLEDGED AND AGREED:

**FIRST AMERICAN TITLE INSURANCE
COMPANY**


By:_____
Name:_____
Title:_____


4

10290302

# **EXHIBIT 6**

## Buchanan Ingersoll ⚜ Rooney PC
### Attorneys & Government Relations Professionals

**Jason P. Wrona**
412 562 3920
jason.wrona@bipc.com

One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410
T 412 562 8800
F 412 562 1041
www.buchananingersoll.com

June 26, 2014

**VIA UPS (OVERNIGHT) AND E-MAIL (dgrodnick@firstam.com)**

David B. Grodnick, Esq.
Vice President / NJ NCS Area Manager
First American Title Insurance Company
National Commercial Services
104 Carnegie Center, Suite 101
Princeton, NJ 08540

> Re:   Purchase and Sale Agreement dated as of March 18, 2014, between Mint Hill/Kerr/Nashville, LLC, a Delaware limited liability company ("Seller"), and SPC Acquisition Company LLC, a New Jersey limited liability company ("Buyer"), as amended by First Amendment to Purchase and Sale Agreement dated June 20, 2014, to be effective as of June 6, 2014 (the "First Amendment"), between Seller and Buyer (collectively, the "Purchase Agreement")

Dear Mr. Grodnick:

Please be advised that Buchanan Ingersoll & Rooney PC represents Seller with respect to the above-referenced Purchase Agreement, a copy of which is attached as Exhibit A. Capitalized terms used herein have the meaning ascribed thereto in the Purchase Agreement.

This letter constitutes written notice to the Title Company and Buyer of a Payment Default pursuant to Section 7 of the First Amendment. Specifically, Buyer has failed to make the Purchase Price Payment to Seller and failed to deposit the Additional Earnest Money Deposit with the Title Company, as required by the First Amendment. Pursuant to Section 7 of the First Amendment, you are hereby instructed to promptly deliver to Seller all Earnest Money held by Title Company, in the amount of $200,000.00, by wire transfer of funds to the account of Seller designated by the wire instructions attached hereto as Exhibit B.

Furthermore, Seller hereby terminates the Purchase Agreement and all duties and obligations of Seller thereunder. The Purchase Agreement is null, void and of no further legal effect, except for those duties and obligations that expressly survive the termination of the Purchase Agreement, including, without limitation, Buyer's obligations to make the Purchase Price Payment to Seller and to deposit the Additional Earnest Money Deposit with the Title Company. Nothing in this letter or in the Purchase Agreement shall be deemed a waiver of Seller's right and entitlement to the Purchase Price Payment or Additional Earnest Money Deposit or any other rights and remedies of Seller under the Purchase Agreement.

June 26, 2014
Page 2

     Please return to my attention all executed original closing and other documents of Seller delivered to the Title Company in escrow pursuant to our escrow letter dated June 4, 2014, a copy of which is attached hereto as <u>Exhibit C</u>.

     Please advise when the wire of the Earnest Money has been commenced and contact me with any questions regarding the foregoing instructions.

        Very truly yours,

        Jason P. Wrona

JPW/mas

cc:    Donald L. Hanson (via UPS)
       Mark Tipperman (via UPS and e-mail: mark@relawyer.org)
       Scott Irmscher (via e-mail)
       Mark Bozzone (via e-mail: mark@baydevco.net)
       Alex Braden (via e-mail: abraden@dilworthlaw.com)
       Craig Fuller (via e-mail: craig.fuller@marcusmillichap.com)

10330788